THE DISTRICT COURT OF GUAM

| UNITED STATES OF AMERICA, | CRIMINAL CASE NO. 20-00015 |
|---|---|
| Plaintiff, | |
| vs. | **FINDINGS OF FACT AND** |
| MONICA ROSE CALVO, | **CONCLUSIONS OF LAW** |
| Defendant. | |

Pending before the court is Petition for Revocation of Supervised Release[1] alleging the Defendant tested positive for methamphetamine as indicated on four drug testing sweat patches applied on her person, subsequently removed and analyzed by the laboratory. *See* Violation Pet., ECF No. 177. The Defendant denied using any illicit substances, and the court held an evidentiary hearing on September 9, 2025. *See* Mins., ECF No. 196. Based on the evidence presented and testimony received, the court issues its Findings of Fact and Conclusions of Law, finding that the Government has established by a preponderance of the evidence that the Defendant violated the terms of her supervised release.

**I.    BACKGROUND**

      A.    Conviction, Sentence and Post-Conviction Conduct

On November 30, 2023, the court sentenced the Defendant to time served (about 8 months and 15 days) and 60 months of supervised release for the offense of Conspiracy to Distribute Methamphetamine Hydrochloride, in violation of 21 U.S.C. §§ 846 and 841(a)(1) and (b)(1)(B)(viii). *See* J. at 1-3, ECF No. 114. Among various conditions of supervised release imposed, the Defendant

---

[1] Along with the petition, the probation officer filed a supporting declaration and a violation worksheet. These filings are collectively referred to as the "Violation Petition."

was ordered to refrain from unlawfully possessing or using a controlled substance and to submit to drug testing. *Id.* at 3 and 5.

On December 19, 2024, the court revoked the Defendant's supervised release term after she entered no contest pleas to testing positive for methamphetamine based on the laboratory results of four drug testing sweat patches. *See* Revocation J., ECF No. 149. The Defendant received a sentence of thirteen days' imprisonment, with credit for time served, and 59 months of supervised release. *Id.* at 2-3. The Defendant was also required to serve sixty days of home detention with location monitoring. *Id.* at 5. The court again ordered the Defendant to refrain from unlawfully possessing or using a controlled substance and to submit to substance abuse testing. *Id.* at 3 and 5.

The Defendant commenced her current term of supervised release on January 7, 2025.

On January 31, 2025, the Defendant entered the drug offender re-entry ("DORE") program, but she was suspended from the program on June 27, 2025. *See* Mins., ECF Nos. 153 and 174.

B. Filing of Violation Petition

On July 14, 2025, the probation officer filed the Violation Petition alleging that the Defendant tested positive for methamphetamine on four sweat patches worn by her during the following periods: (i) January 20-24, 2025, (ii) February 28-March 5, 2025, (iii) March 26-28, 2025, and (iv) April 18-21, 2025. *See* ECF No. 177.

The Defendant denied the allegations, and on August 14, 2025, she filed a Notice of Defense, stating that her challenge to the positive sweat patch results would be based on (1) environmental contamination and (2) source of contamination/drug was not knowing consumption or use of drugs. *See* ECF No. 183.

II. **TESTIMONY AND EVIDENCE PRESENTED**

At the evidentiary hearing held on September 9, 2025, the Government called two witnesses:[2]

---

[2] The Government listed a third individual on its Witness List – Richard Sheriff, the Manager of Regulatory compliance and Senior Certifying Scientist with Clinical Reference Laboratory ("CRL"). *See* USA's Witness List, ECF No. 191. The four sweat patches at issue here were sent to CRL for analysis after they were removed from the Defendant's person. *See* Exs. 3-3, 4-2, 5-2 and 6-2. Because the Defendant was not challenging the reliability of the lab results themselves or questioning the chain of custody, the court determined that Mr. Sheriff's testimony

Dr. Leo Kadehjian and U.S. Probation Chief Grace Flores. The defense presented three witnesses: Benjie Sablan, David Elliott and the Defendant. The relevant portions of the witnesses' testimonies are summarized as follows.

Dr. Kadehjian is a biomedical toxicologist and served as a consultant to the Administrative Office of the U.S. Courts for 25 years. Without objection from the Defendant, the court qualified Dr. Kadehjian as an expert witness. He stated that the sweat patch is composed of an absorbent inner pad and an outer adhesive membrane and is essentially a collection device. If a sweat patch was applied on a donor, the inner patch would absorb any drugs or metabolites that are excreted in the donor's sweat. He further stated that a sweat patch may detect methamphetamine in a donor's system while the sweat patch is worn and up to two days prior to its application. When a sweat patch is removed and sent to the laboratory for analysis, the lab performs an initial screening that tests for the presences of different drugs, and if the initial screening test returns a positive for methamphetamine, the specimen is sent for confirmation testing. During confirmation stage, mass spectrometry technology is used to identify and quantify substances in the specimen. Dr. Kadehjian testified that when methamphetamine is ingested and processed by the body, the liver converts some of it to amphetamine. Thus, in order for the laboratory to report a positive methamphetamine result, the initial screening test must have a positive result for methamphetamine and the confirmation test must also indicate the presence of both methamphetamine and amphetamine. As for environmental contamination, Dr. Kadehjian acknowledged that the "possibility exists" but it was an "unrealistic" possibility. Evid. Hr'g Tr. 44:4-16, ECF No. 200. With regard to whether exposure to an environment where others may be using and smoking methamphetamine may cause a donor's sweat patch to be positive for methamphetamine, based on peer-reviewed published scientific studies, Dr. Kadehjian testified "even in a clandestine lab while meth is being cooked," an individual would have to be in such "smoke-filled contaminated environment for hundreds of thousands of hours" in order to have inhaled enough methamphetamine to get a positive sweat patch result. *Id.* at 115:9-21. When asked whether an exchange of bodily fluids with someone who uses methamphetamine could

---

was unnecessary and excused him. Evid. Hr'g Tr. 11:11-14, ECF No. 200.

result in a positive sweat patch, Dr. Kadehjian testified that a person would have to ingest thousands of liters of someone's saliva and/or semen in order to test positive. Finally, Dr. Kadehjian stated that there are controlled studies that analyzed whether the patch itself could be contaminated from the exterior. Those studies involved placing sweat patches on petri dishes soaked with artificial sweat with a low pH and then methamphetamine that was dissolved in a high pH solution was placed on the sweat patch. Dr. Kadehjian testified that the studies showed that the methamphetamine on the outside of a patch could penetrate the outer surface of the sweat patch and go through to the interior absorbent pad "but only when that methamphetamine was in a basic solution," and he noted that "sweat is not basic, sweat is acidic." *Id.* 113:14-114:1. He further noted that in these external contamination experiments, "no amphetamine was formed," so this could not form the basis for a "positive" sweat patch result. *Id.* 114:3-6.

      Chief Flores testified that she, along with Supervisory U.S. Probation Officer John San Nicolas, supervised the Defendant from January 31, 2025, until the end of May 2025 while she was in the DORE program to ensure that she complied with supervised release conditions imposed by the court. She stated that the four positive sweat patch results were reported to the court in the course of the drug court program, and after the Defendant withdrew from the program, Officer San Nicolas filed the Violation Petition. Chief Flores was asked to review certain government exhibits. With regard to sweat patch results contained in Government Exhibit 7, some results reflected positives for amphetamine, but Chief Flores testified that these were not included in the Violation Petition because the result was likely caused by the Defendant taking her prescription medication. Chief Flores stated that on more than one occasion, the Defendant claimed that the cause of her positive sweat patches may be "environmental." *Id.* 54:2-6 and 55:2-17. Chief Flores further testified that she phoned the Defendant on March 18, 2025, to discuss a positive sweat patch, and the Defendant admitted that she "used." *Id.* 54:6-9. Chief Flores felt like she was finally making progress with the Defendant and asked her to come to the probation office the following day so they could discuss the matter further. When the Defendant appeared the following day, however, the Defendant recanted her prior admission and denied using any drug. *Id.* 54:16-25. Chief Flores stated that during a conversation she had with the Defendant in February, the Defendant mentioned that her

significant other worked at the shop. *Id.* 55:20-23. Chief Flores inquired whether the Defendant's significant other was "using," and the Defendant responded that she hasn't "tested him but he is a trigger" and that her sweat patch "may be positive." *Id.* 55:23-56:3. Chief Flores stated that because the Defendant was unsure whether her significant other or other employees were using drugs, the Defendant installed cameras in the shop and the supply room. When questioned about whether the Defendant received a sanction for the positive sweat patch worn on January 20-24, 2025, Chief Flores could not recall whether the Defendant was ordered to perform community service as a sanction, but Chief Flores's notes indicated that the Defendant completed her community service.

Mr. Sablan testified that he works at the small engine repair shop owned by the Defendant's father and that he normally worked six days each week and between six to eight hours per day, depending on the number of customers the shop had. Mr. Sablan identified the places depicted in the defense exhibits as various rooms in the shop and the Defendant's private quarters, which adjoined the shop. When questioned about where he would go if he needed the bathroom during working hours since the one bathroom in the shop was inoperable, Mr. Sablan testified that he and the two other employees would just urinate in the yard by the broken cars or went home to use the bathroom, but if they felt comfortable enough, they used the Defendant's restroom. Mr. Sablan stated that he used the Defendant's restroom daily, sometimes more than once a day, for 30-minute periods. He also testified that he would spend about 20 minutes during his work day in the Defendant's living room (Ex. N). He confirmed that he was engaged in a sexual relationship with the Defendant between January and May 2025 and that during the course of said relationship they would share bodily fluids, which defense counsel defined as sweat, saliva or semen. *Id.* 72:23-73:4. Mr. Sablan testified that during sexual intercourse with the Defendant, he rubbed her sweat patch. Mr. Sablan stated that they often had sexual intercourse for hours.

Mr. Elliott is a Task Force Officer with the Drug Enforcement Administration ("DEA").[3]

---

[3] Mr. Sablan asserted his Fifth Amendment right to remain silent when asked whether he was actively using methamphetamine between January and May 2025. Evid. Hr'g Tr. 72:8-20, ECF No. 200. The court thus granted defense counsel's request to call an additional witness not identified in the Defendant's First Amended Witness List (ECF No. 194). Defense counsel noted that DEA

He testified that on September 3, 2025, he interviewed Mr. Sablan and Brian Calvo, employees of the shop owned by the Defendant's father, about their use of drugs in the shop. Mr. Elliott stated that Mr. Sablan told him that they smoke here and there around the shop but never smoked around the Defendant. Mr. Elliott testified that Mr. Sablan mentioned that he slept with the Defendant. Mr. Elliott took this statement to mean that Mr. Sablan and the Defendant slept next to each other in the same bed together when they were in a relationship; he did not ask any questions about the details of Mr. Sablan's sex life.

The Defendant testified that she did not knowingly ingest methamphetamine between January and May 2025. She confirmed that Mr. Sablan smokes methamphetamine at various locations in her father's shop as well as in her bathroom and her personal residence. The Defendant stated that at first she was not aware that he was using methamphetamine at the shop and in her private quarters, however, by the time a second or third patch reported positive for methamphetamine, the Defendant became suspicious. The Defendant confronted the shop's employees, including Mr. Sablan, and they admitted that they had been using methamphetamine while working at the shop. After she learned they had been smoking methamphetamine at the repair shop, the Defendant had additional video surveillance cameras installed in April, but even with the additional cameras, the Defendant said that she never saw the employees using drugs at the repair shop. The Defendant stated she had no authority to fire the employees for their drug use. The Defendant testified that Mr. Sablan told her he smoked daily at his place of employment, approximately six times per day. She stated that she would go to shop area about six to eight times each day, for a total of about 30 minutes each day at the shop. The Defendant estimated she went to the supply room regularly, about six to eight times each day, and spent about four hours total each day in the supply room.

The court received into evidence various exhibits proffered by the government and the Defendant. These include Dr. Kadehjian's curriculum vitae (Ex.1) and a letter dated December 6, 2015, written by Dr. Kadehjian and addressed to David Lattanzio at PharmChem providing Dr.

---

Task Force Officer David Elliott prepared a DEA Form 6 which described Mr. Elliott's conversation with Mr. Sablan regarding Mr. Sablan's drug use.

Kadehjian's professional opinion on whether residential exposure to residual methamphetamine from prior use and/or manufacture of methamphetamine could be the basis for a sweat patch test result being reported positive for methamphetamine (Ex. 10). Additionally, the court admitted Government Exhibits 3 through 6 consisting of four PharmChek chain of custody forms for the four positive sweat patches that form the basis of the Violation Petition, together with the CRL lab reports and photos taken of the Defendant on the days the patches were applied and subsequently removed from her person. Also admitted were the Defendant's Revocation Judgment (Ex. 11) and six PharmChek chain of custody forms for six sweat patches worn by the Defendant during various intervals between January and May 2025, along with the DRL lab reports that were negative for methamphetamine (Ex. 7). The court further received into evidence numerous photographs of the entrance to the repair shop owned by the Defendant's father and various rooms within the shop (Ex. A, B, D through M and Q) and photographs of the Defendant's living room and bathroom (Exs. N through P). The court also admitted Exhibit X, a PharmChek Technical Guide for PharmChek sweat patch.

Finally, the court took judicial notice of the Minute Entry for DORE proceedings held on February 28, 2025, which reflected that a sanction was imposed on the Defendant that required her to perform 24 hours of community service. *See* Mins., ECF No. 157.

**III.    LEGAL STANDARD**

During the period of supervised release, the district court may revoke the period of supervised release if the district court finds by a preponderance of the evidence that the defendant violated the terms of that supervised release. 18 U.S.C. § 3583(e)(3). Revocation is mandatory if the Defendant tests positive for illegal controlled substance more than three times over the course of one year. *See* 18 U.S.C. § 3583(g)(4).

**IV.    ANALYSIS**

As noted above, the Defendant's Notice of Defense asserted that the positive results for methamphetamine were caused by environmental contamination and/or that she did not knowingly consume or use of drugs. *See* ECF No. 183. During closing arguments, however, defense counsel raised two new arguments that had not been included in the Notice of Defense or asserted at any

hearing following the filing of the Violation Petition. The question the court must first decide is whether it will address the merits of these newly-raised arguments or whether said arguments should be deemed waived.

### 1. Newly Raised Arguments

At the conclusion of the evidentiary hearing, defense counsel first argued that the court must dismiss the allegation regarding the sweat patch worn January 20-24, 2025, which tested positive for methamphetamine because the Defendant had already been sanctioned for this alleged violation. She asserted that punishing the Defendant again would raise double jeopardy concerns.

Second, defense counsel noted that Section 3583(d) requires that

> [a] drug test confirmation shall be a urine drug test confirmed using gas chromatography/mass spectrometry techniques or such test as the Director of the Administrative Office of the United States Courts after consultation with the Secretary of Health and Human Services may determine to be of equivalent accuracy.

18 U.S.C. § 3583(d).

Counsel argued that the Violation Petition should be dismissed since the Government failed to present any evidence that the drug testing sweat patches had been approved for use by the Director of the Administrative Office of the United States Courts after consultation with the Secretary of Health and Human Services. Defense counsel further asserted that confirmation testing of the Defendant's samples provided during testing by urinalysis have all come back negative for methamphetamine.

Generally, arguments raised for the first time at oral argument are deemed waived. *See e.g. United States v. Bogard*, No. CR 20-49-M-DLC, 2021 WL 1250356, at *5 (D. Mont. Apr. 5, 2021) (arguments first raised at suppression hearing and never briefed deemed waived); *Foster v. Adams & Assocs., Inc.*, No. 18-CV-02723-JSC, 2020 WL 3639648, at *3 n.3 (N.D. Cal. July 6, 2020) (citing *Booth v. United States*, 914 F.3d 1199, 1206 (9th Cir. 2019) (declining to consider argument raised for the first time during oral argument); *Sloan v. Gen. Motors LLC*, No. 16-CV-07244-EMC, 2020 WL 5517244, at *5 (N.D. Cal. Sept. 14, 2020) (same).

The court is inclined to deem these new arguments as being waived, especially since on August 5, 2025, the court ordered the Defendant to file a brief outlining the nature of her defense

with respect to her denials of the alleged violations so that the government could adequately prepare and subpoena the appropriate witnesses. *See* Mins., ECF No. 179. The Defendant's Notice of Defense filed on August 14, 2025, did not assert these arguments as possible defenses. *See* ECF No. 183. It is fundamentally unfair for the Defendant to belatedly assert that the Government failed to present any evidence that the Director of the Administrative Office of the United States Courts has approved confirmation of drug use through drug testing sweat patches. Had the Defendant raised this issue and her double jeopardy argument in her Notice of Defense, perhaps counsel for the Government would have been able to present evidence or argument to the contrary. The court could have also conducted research on the issues and questioned counsel at the hearing. Because the Defendant only raised these issues for the first time during closing argument, the court deems them to be waived.

Nevertheless, the court will address the arguments because they are issues of first impression for this court, and the court's ruling can provide guidance to other defendants and their counsel. The court finds that there is no double jeopardy issue at this stage since the court is not now imposing a sanction against the Defendant for the alleged violations. Rather, the court is determining whether or not the Defendant violated a condition of supervised release. Any sanction to be imposed will be at a later date. Thus, the Defendant is free to renew her double jeopardy argument at the appropriate time.

With regard to the Defendant's second argument regarding Section 3583(d), the court notes that "sweat patches are used in many district courts through the country" and "[t]he sweat patch device has been approved for use by the U.S. Food and Drug Administration ("FDA")[4] and the Administrative Office of the U.S. Courts." *United States v. Pangelinan*, No. 1:24-CR-00020-01, 2025 WL 27800, at *4 (D. N. Mar. I. Jan. 6, 2025). *See also United States v. Meyer*, 483 F.3d 865, 869 (8th Cir. 2007) ("It is important to note that the Food and Drug Administration cleared the PharmChem sweat patch technology back in 1990. Today, the sweat patch is a widely used method

---

[4] The FDA is part of the Department of Health and Human Services. FDA Organization, https://www.fda.gov/about-fda/fda-organization, (last visited Oct. 9, 2025).

for drug testing that is authorized by the Administrative Office of the United States Courts."). This is consistent with the testimony of Dr. Kadehjian who stated that in the early 1990s, the sweat patch was submitted to the FDA for approval as a medical device, and after all the tests used by the laboratory were approved by the FDA, the first major agency to use the sweat patches was the U.S. Courts. Evid. Hr'g Tr. 15-16, ECF No. 200. More importantly, Dr. Kadehjian testified that at the confirmation stage of the laboratory analysis of the sweat patch, testing is done by mass spectrometry. *Id.* 27:2-7. Thus, confirmation of the positive sweat patches by mass spectrometry satisfies the technical requirement of Section 3583(d).

      2.    <u>Whether positive sweat patch results were caused by environmental contamination</u>

The Defendant contends that the four sweat patches which reported positive for methamphetamine resulted from her exposure to various environmental factors. She argues that she spent countless hours in various areas in the repair shop where the employees admitted they smoked methamphetamine daily. According to Dr. Kadehjian's expert testimony, a person would have to be in a "smoke-filled contaminated environment for hundreds of thousands of hours in order to have an inhalation of enough methamphetamine and . . . would have to be there while this use is going on" in order for the person to get a positive test result. Evid. Hr'g Tr. 115:9-21, ECF No. 200. Here, the Defendant testified that she never saw the repair shop employees smoking methamphetamine while working, even after she had additional video surveillance cameras installed. So even if she spent 24 hours each day for five months (January through May 2025) in the repair shop where methamphetamine was smoked, this would only equate to 3,624 hours of exposure to methamphetamine in the air. This is no where near the hundreds of thousands of hours Dr. Kadehjian testified was needed in a smoke-filled contaminated environment in order inhale enough methamphetamine in the air to test positive. Thus, the court finds that the Defendant's four positive sweat patches did not result from being exposed to methamphetamine in the air at the repair shop.

The Defendant next argues that she could have tested positive because she exchanged bodily fluids with her sexual partner who used methamphetamine daily. The court also finds no merit to this argument. Dr. Kadehjian testified that based on peer reviewed published literature involving

experiments on sexual intimate exposure, "there is no reasonable basis for [these] claimed exposures to lead to a positive sweat patch result as has been observed in this case." *Id.* 114:7-10. He stated that a person would have to ingest "thousands of liters" of someone's bodily fluids to have a positive test result. *Id.* 113:2-12. Based on this testimony, the court finds that the four positive sweat patch results were not caused by the Defendant's exchange of bodily fluids with a known methamphetamine user.

Finally, the Defendant surmises that the sweat patches were positive because Mr. Sablan rubbed the sweat patches applied on her while they were intimate. Based on Dr. Kadehjian's testimony, the court disagrees with the Defendant's premise. Dr. Kadehjian discussed a laboratory experiment he reviewed and stated that even when sweat with methamphetamine was placed on the outside of a patch, no methamphetamine penetrated the patch. *Id.* 113:14-114:2. Here, the photographs taken of the Defendant and the sweat patches just prior to their removal do not indicate that they had been tampered with, so it is not plausible that Mr. Sablan rubbing the exterior of the sweat patches would cause the test results to return positive for methamphetamine.

Even if the court accepted the Defendant's claim that environmental factors caused her to test positive for methamphetamine, this would not explain why only four sweat patches returned positive while six other sweat patches worn during this five month period were negative for methamphetamine. *See* Ex. 7. The six negative sweat patches belie the Defendant's assertion that outside factors caused her to test positive. Overall, Dr. Kadehjian testified that while environmental contamination is a possibility, it is unrealistic. The court finds that the four positive sweat patches at issue here were not caused by the Defendant's exposure to environmental factors.

3. <u>Whether Defendant knowingly consumed or used drugs</u>

Finally, the Defendant argues that she did not knowingly consume or use drugs. Here, there was no evidence presented that the Defendant unknowingly consumed something that was spiked or laced with methamphetamine or was somehow forced to ingest it against her will. The record before the court is that (1) the Defendant was convicted of a drug offense, (2) she had numerous pretrial violations for testing positive for and admitting to the use of methamphetamine, (3) her supervised release term was revoked in December 2024 based on her no contest pleas to four positive

sweat patches, and (4) the Defendant was in a relationship with an admitted methamphetamine user between January and May 2025. Because the court has already determined that environmental factors could not have been the bases for her positive sweat patches, the court is left with the only logical conclusion that the Defendant knowingly consumed or used drugs in violation of her supervised release condition.

## V. CONCLUSION

For the reasons set forth above, the court finds that the Government has met its burden of proving by a preponderance of the evidence that the Defendant violated a condition of her supervised release by using a controlled substance, as confirmed by the laboratory results which reported that the four sweat patches worn by the Defendant during the relevant periods at issue here were positive for methamphetamine. Having found that the Defendant violated her supervised release condition, the court schedules a hearing on October 28, 2025, at 9:15 a.m. for the parties to present their argument on an appropriate disposition for the violations and for the Defendant to answer to the new alleged violation set forth in the probation officer's Supplemental Declaration.[5] The court orders the Clerk's Office to issue a summons for the Defendant to appear at said hearing.

**IT IS SO ORDERED.**



/s/ Michael J. Bordallo
    U.S. Magistrate Judge
**Dated: Oct 10, 2025**

---

[5] The Supplemental Declaration was filed on September 26, 2025, after the evidentiary hearing. *See* ECF No. 199. It alleges that the Defendant tested presumptive positive for methamphetamine on a urinalysis test conducted on September 3, 2025. The positive result was later confirmed by laboratory analysis of the urine specimen.